UNITED STATES of America

v.

Christopher J. BENYO, Charles E. Johnson, Jr., Joseph Michael Kennedy, John P. Tuli, Kent D. Wakeford, and Scott E. Wiegand, Defendants.

Criminal Action No. 1:05cr12.

United States District Court, E.D. Virginia, Alexandria Division.

Aug. 19, 2005.

Charles Connolly, Dana Boente, United States Attorney's Office, Alexandria, VA, for Plaintiff.

Terrance Reed, Lankford, Coffield & Reed PLLC, Alexandria, VA, for Defendant Benyo.

Alan Yamamoto, Alexandria, VA, Yale Galanter, Yale L. Galanter PA, Fort Lauderdale, FL, for Defendant Johnson.

David Schertler, Coburn & Schertler LLP, Washington, DC, for Defendant Kennedy.

Mark Hulkower, Steptoe & Johnson LLP, Washington, DC, for Defendant Tuli.

Henry Asbill, Cozen & O'Connor PC, Washington, DC, for Defendant Wakeford.

Robert Ullmann, Nutter, McClennen & Fish LLP, Boston, MA, for Defendant Wiegand.

### OPINION AND ORDER

KELLEY, District Judge.

By Order dated March 4, 2005, the Court vacated its previous order freezing *all* of defendants' assets in anticipation of a criminal forfeiture judgment. (Docket No. 83.) On March 16, 2005, the United States moved the Court to reconsider its March 4 Order. (Docket No. 85.) Because the Court has concluded that it acted prematurely when issuing its March 4 Order, the United States' Motion to Reconsider is **GRANTED in part.** The Court will conduct an evidentiary hearing on August 30,

2005 in order to make a factual finding on the question whether a nexus exists between the property being restrained and the criminal activity alleged. The March 4 Order will remain in effect until an Order is issued at or shortly after the August 30 evidentiary hearing.

## I. Procedural History

By Indictment returned on January 10, 2005, a Grand Jury sitting in the Eastern District of Virginia charged the defendants in this case with a variety of white collar crimes, including Conspiracy (18 U.S.C. § 371), Securities Fraud (15 U.S.C. §§ 78j(b) & 78ff) and Wire Fraud (18 U.S.C. §§ 1343 & 1346). The charges arise out of certain business dealings between America Online, Inc. ("AOL") and PurchasePro.com, Inc. ("PurchasePro"). Defendants Kent D. Wakeford and John P. Tuli (collectively, the "AOL defendants") are former executives of AOL. The remaining four defendants, Christopher J. Benyo, Charles E. Johnson, Jr., Joseph Michael Kennedy, and Scott E. Wiegand, are former executives of PurchasePro (collectively, the "PurchasePro defendants").

On January 11, 2005, the defendants appeared in Court voluntarily. Each defendant surrendered his passport and was released on a $100,000 unsecured bond. At least one attorney for each defendant appeared at the Courthouse with his or her client and filed a formal Notice of Appearance.

On the same day as defendants' Initial Appearances, the United States moved to restrain the defendants' assets in anticipation of a forfeiture judgment. (Docket No. 3.) The Indictment alleges generally that certain bonuses paid to the PurchasePro defendants in April 2001 are proceeds traceable to illegal conduct, *i.e.*, the alleged illegal manipulation of PurchasePro's earnings. The United States represented to the Court that 21 U.S.C. § 2461(c) and 18 U.S.C. § 981 authorized the forfeiture in this case of both proceeds traceable to the alleged ill-gotten gains and substitute assets.

Although each defendant was represented by counsel of record (all of whom were in the Courthouse that day), the United States filed its motion *ex parte* and argued in its brief that "no requirement exists [in the restraining order statute] for notice or an evidentiary hearing prior to the issuance of the restraining order." (Docket No. 3, at p. 5.) Based upon the United States' representations, the Court entered on January 11, 2005 a form order submitted by the United States. This Order restrained *all* of the defendants' assets, not just the amount of ill-gotten gains that each defendant received.[1] (Docket No. 62.) The United States subsequently enforced the January 11 Order by sending it to numerous financial institutions and filing Lis Pendens to encumber defendants' real property. (*See, e.g.*, Docket Nos. 34–36.)

All defendants[2] moved to dissolve the Court's January 11 *ex parte* Order.

---

**1.** The United States' form order froze *all* of the AOL defendants' assets even though they never received the allegedly tainted bonus payments. Similarly, the United States' form order froze *all* of the assets of defendants Benyo and Wiegand even though they received allegedly tainted bonus payments in the amount of only $100,000 each. The United States justifies this overreaching via the following alchemic formula: (1) the forfeitable property totals $2.3 million (sum of the

defendants' retention bonuses); (2) the defendants are jointly and severally liable for the total amount to be forfeited; (3) 28 U.S.C. § 2461(c) authorizes the forfeiture of substitute assets, so no tracing is necessary; and (4) thus, any asset may be seized from any defendant at any time to satisfy the total amount to be forfeited.

**2.** Defendant Kennedy subsequently reached a compromise with the United States and with-

(Docket Nos. 56–64, 66–67, 69–71, 73.) Defendants' submissions established that the Order freezing *all* of their assets prevented each defendant from paying private counsel or providing for himself and his family. Defendants' submissions further made a *prima facie* showing of a bona fide reason to believe that the grand jury erred in determining that the PurchasePro bonuses are proceeds, or traceable proceeds, of the charged offenses.

Based on the parties' submissions and the proffers of counsel at a hearing held on February 16, 2005, the Court concluded that defendants had met the two-part test necessary to challenge the *ex parte* pretrial restraint of assets. *See United States v. Jones,* 160 F.3d 641, 647 (10th Cir.1998). The Court further concluded, albeit implicitly, that the United States had not demonstrated probable cause to believe that the retention bonuses were forfeitable property. These findings of fact underpinned the Court's March 4 Order.[3]

The United States filed a Motion to Reconsider on March 16, 2005. (Docket No. 85.) Before the Court could hold a hearing and rule on the Motion to Reconsider, the United States filed a Notice appealing the March 4 Order to the United States Court of Appeals for the Fourth Circuit. (Docket No. 88.) The appeal challenges the Court's March 4 Order only as it applies to the PurchasePro defendants. The United States does not challenge on appeal that portion of the March 4 Order that releases the assets of the AOL defendants.[4] Those defendants never received any funds (bonuses or otherwise) from PurchasePro.

## II. Factual Background

PurchasePro, which is now defunct, was a publicly traded company that developed and sold computer software used to facilitate business to business transactions. (Indictment p. 2, ¶¶ 1–2.) The Indictment alleges that the defendants conspired amongst themselves and with others during March and April 2001 to orchestrate a series of sham sales of PurchasePro software licenses. (Indictment p. 11, ¶¶ 4–8.) The Indictment further charges that "[b]ased on these fraudulent arrangements, the conspirators and others falsely told and caused others to tell Purchase-Pro's outside auditors and the Board of Directors that PurchasePro had met its first quarter 2001 revenue target of $42 million." (Indictment p. 17, ¶ 30.) This had the effect of artificially inflating PurchasePro's stock price.

The forfeiture issue in this case arises from page 32, ¶ 137 of the Indictment. That allegation states:

> 137. On or about April 5, 2001, JOHNSON, WIEGAND and others *caused* PurchasePro to pay "retention bonuses" to the following people in the following amounts:
>
> a. JOHNSON—$2 million;
>
> b. WIEGAND—$100,000;
>
> c. KENNEDY—$100,000;
>
> d. BENYO—$100,000.

---

drew his challenge to the January 11 Order. (*See* Docket Nos. 79, 86, 89.)

3. The March 4 Order states the Court's determination that 28 U.S.C. § 2461(c) does not authorize the forfeiture of substitute assets. However, this issue will not be reached if the Court finds, as a matter of fact, that the retention bonuses are not forfeitable property in the first place.

4. The United States has also abandoned its attempts in this Court to restrain the assets of the AOL defendants. (*See* Transcript of Hearing held on August 11, 2005.) Accordingly, counsel for the AOL defendants need not appear at the August 30 evidentiary hearing.

(Indictment p. 32, ¶ 137.) (Emphasis added). The Indictment implies, but does not expressly state, that these bonuses were paid in furtherance of the conspiracy. (Indictment p. 17, ¶ 33.)

It is undisputed that the PurchasePro defendants did not misappropriate or receive through stock sales the monies enumerated on page 32, ¶ 137 of the Indictment. The bonuses at issue were approved by a vote of PurchasePro's Board of Directors and all applicable taxes were withheld at the time the bonuses were paid to the PurchasePro defendants. It is also undisputed that PurchasePro paid retention bonuses to a number of employees, not just the PurchasePro defendants.

The bonuses at issue were initially proposed by PurchasePro's outside law firm (Brobeck, Phleger & Harrison) as a means of retaining key personnel. This recommendation was evaluated by the Board's Compensation Committee, which was chaired by an outside director named John Chiles. None of the defendants sat on this committee.

The Compensation Committee recommended that the Board adopt a formal employee retention plan (the "2001 Retention Plan"). The Compensation Committee further recommended that the Board authorize the payment of retention bonuses of $100,000 each to defendants Benyo, Kennedy, and Wiegand, as well as to eight (8) other PurchasePro executives.

The Board adopted the Compensation Committee's recommendations, and on April 5, 2001, PurchasePro paid the bonuses to defendants Benyo, Kennedy, and Wiegand, among others. Each of the defendants signed statements that day agreeing to the restrictions contained in the 2001 Retention Plan. Among other things, each of the defendants agreed to repay part or all of his bonus if he left PurchasePro prior to certain dates.

At a separate meeting held on April 10, 2001, the Board voted to pay a $2 million retention bonus to defendant Charles E. Johnson, Jr.[5] Mr. Johnson was the founder and chief executive officer of PurchasePro. This bonus was paid on April 11, 2001. As did the other PurchasePro defendants, Mr. Johnson signed a statement acknowledging the 2001 Retention Plan and agreed to repay part or all of his bonus if he left PurchasePro before certain dates.

The Board's approval and the company's payment of the retention bonuses occurred before PurchasePro's first quarter earnings were announced on April 26, 2001. (Indictment p. 17, ¶ 31.) On May 29, 2001, PurchasePro filed with the Securities Exchange Commission its quarterly report on Form 10–Q for the quarter ended March 31, 2001. (Indictment p.17, ¶ 32.)

### III. Analysis

#### A. Jurisdiction to Grant the Motion to Reconsider

The United States initially contends that the Court now lacks jurisdiction to grant the relief the United States itself sought in the March 16 Motion to Reconsider. (See United States' Jurisdictional Statement, Docket No. 91.) The United States relies exclusively on the Fourth Circuit's decision in United States v. Christy, 3 F.3d 765 (4th Cir.1993) to argue that its April 4, 2005 Notice of Appeal divested this Court of jurisdiction over the pre-trial restraint of defendants' assets.

The defendant in Christy simultaneously filed a Motion to Reconsider and a Notice of Appeal. The Fourth Circuit construed the Notice of Appeal as having been filed

---

**5.** Unlike the other PurchasePro defendants, Mr. Johnson sat on PurchasePro's Board of Directors. He left the Board meeting during the discussion and vote on his retention bonus.

first. As a result, the Notice of Appeal "divested the district court of its jurisdiction over the case and conferred jurisdiction upon this Court." *Id.* at 767.

■ In the instant case, by contrast, the Motion to Reconsider was filed nineteen (19) days *before* the Notice of Appeal. The Fourth Circuit addressed this scenario in *Christy,* stating:

> [I]f [the defendant] had moved for reconsideration *before* filing his notice of appeal, the district court would have been *required* to rule upon the motion. If the motion were denied, ... [the defendant] would then have had ten days in which to file a notice of appeal.

*Id.* at 767. (Emphasis added).

The language quoted above arguably is dicta. However, the Fourth Circuit recently followed the procedure outlined in *Christy.* In *United States v. Johnson,* 95 Fed.Appx. 496 (4th Cir.2004) (unpublished), the Court found ineffective a Notice of Appeal filed after a Motion to Reconsider. The Court explained:

> When a timely motion for reconsideration is filed in a criminal case, the ten-day appeal period does not begin to run until after the motion to reconsider has been decided by the district court.... Accordingly, [the defendant's] notice of appeal is premature.
>
> While the disposition of a motion for reconsideration by the district court has been held to establish jurisdiction in the appeals court, ... [the defendant's] notice of appeal will not be effective until the district court disposes of the motion to reconsider.
>
> We are, therefore, constrained to remand this case once more so that the district court may rule on the motion for reconsideration. The parties should inform this Court when the district court has ruled and provide a copy of the

order disposing of the motion to reconsider.

*Id.* at 497. (Citations omitted.)

The Fourth Circuit's opinions in *Christy* and *Johnson* do no more than follow well-established Supreme Court precedent. In *United States v. Dieter,* 429 U.S. 6, 97 S.Ct. 18, 50 L.Ed.2d 8 (1976), the Supreme Court stated:

> [T]he consistent practice in civil and criminal cases alike has been to treat timely petitions for rehearing as rendering the original judgment nonfinal for purposes of appeal for as long as the petition is pending.... To have held otherwise might have prolonged litigation and unnecessarily burdened this Court, since plenary consideration of an issue by an appellate court ordinarily requires more time than is required for disposition by a trial court of a petition for rehearing.

*Id.* at 8, 97 S.Ct. 18. (Citations and footnote omitted). The Supreme Court went on to emphasize "the wisdom of giving district courts the opportunity promptly to correct their own alleged errors...." *Id.* (citing *United States v. Healy,* 376 U.S. 75, 84 S.Ct. 553, 11 L.Ed.2d 527 (1964)).

Given the sequence of filings in this case, it is clear the United States' appeal is not ripe for consideration. "[I]t [is] generally understood that a federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously." *Griggs v. Provident Consumer Disc. Co.,* 459 U.S. 56, 58, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982). Whether the United States' appeal is dismissed for lack of jurisdiction, *see, e.g., United States v. Davis,* 924 F.2d 501, 503–06 (3d Cir. 1991), or held in abeyance pending a final ruling on the Motion to Reconsider, *see, e.g., United States v. Garrison,* 963 F.2d 1462, 1465–66 (11th Cir.1992); *United States v. Varah,* 952 F.2d 1181, 1183 (10th

Cir.1991), the question whether defendants' assets should be restrained pending trial rests exclusively with this Court—at least for the moment.

## B. The Necessity of an Evidentiary Hearing

Section 853(e)(1) of Title 21 of the United States Code provides, in pertinent part, that "[u]pon application of the United States, the court *may* enter a restraining order or injunction ... to preserve the availability of property described in subsection (a) for forfeiture under this section." (Emphasis added). 21 U.S.C. § 853(a)(1) identifies forfeitable property as "any property constituting, or derived from, any proceeds the [convicted felon] obtained, directly or indirectly, *as the result of* such violation." (Emphasis added).

The United States contends in its Motion to Reconsider that the word "may" as used in 21 U.S.C. § 853(e)(1) really means "shall," *i.e.*, that the Court has no discretion to decline the United States' demand that it restrain forfeitable property pending trial. (Docket No. 85, at p. 5–6.) Whether or not the case law supports the United States' construction of the statute, the Government has a more fundamental problem in its quest to restrain defendants' assets.

As noted above, 21 U.S.C. § 853(a)(1) requires the United States to prove that the defendants obtained the allegedly forfeitable property "as the result of" the illegal activity charged in the Indictment. Stated alternatively, the Government must show that defendants Benyo, Johnson, and Wiegand would not have received the retention bonuses "but for" the predicate illegal activity. *See United States v. Horak,* 833 F.2d 1235, 1243 (7th Cir.1987); *United States v. Modi,* 178 F.Supp.2d 658, 662 (W.D.Va.2001).

The Indictment alleges that "JOHNSON, WIEGAND and others *caused* Pur-

chasePro to Pay 'retention bonuses.' " (Indictment p.32, ¶ 137.) (Emphasis added). However, the facts proffered in the parties' submissions do not support this contention. The factual submissions instead show that PurchasePro's outside law firm originated the idea of retention bonuses. The 2001 Retention Plan was recommended by a disinterested Compensation Committee and approved by a disinterested Board of Directors. The retention bonuses were paid to eight (8) non-defendants. There is no evidence that any of the defendants orchestrated the retention bonus process or procured the favorable Board votes.

The United States recast its forfeiture attack at the hearing held on February 16, 2005. Rather than relying on the Indictment's allegations of direct causation, the Government postulated the theory that the Board approved the retention bonuses in April 2001 only because it believed that PurchasePro had really earned $42 million in the first quarter of 2001. (Tr. at 44.) The problem with this theory is that it is just a theory. The United States neither provided nor proffered any testimony from PurchasePro's directors explaining why they voted to adopt the 2001 Retention Plan and pay bonuses pursuant thereto.

■ The Court will give the United States another, more formal opportunity to prove that defendants Benyo, Johnson, and Wiegand received their retention bonuses "as the result of" the illegal activity alleged in the Indictment. At the upcoming August 30 evidentiary hearing, the United States need not prove "but for" causation beyond a reasonable doubt or even by a preponderance of the evidence. The standard for judging the Government's showing at this stage of the case "is probable cause, which is defined as 'a reasonable ground for belief ... supported by less than prima facie proof but more than

mere suspicion.'" *United States v. Wittig,* 333 F.Supp.2d 1048, 1052 (D.Kan.2004) (quoting *United States v. Melrose E. Subdivision,* 357 F.3d 493, 505 (5th Cir.2004)). "The probable cause determination in forfeiture cases looks to all of the circumstances and 'must be judged … with a common sense view to the realities of normal life.'" *Wittig,* 333 F.Supp.2d at 1052 (quoting *United States v. One Gates Learjet,* 861 F.2d 868, 870 (5th Cir.1988)).

### IV. Conclusion

For the reasons stated above, The United States Motion to Reconsider is **GRANTED in part.** The Court will conduct an evidentiary hearing on August 30, 2005 to determine whether the retention bonuses paid in this case are forfeitable property within the meaning of 21 U.S.C. § 853(a)(1).

The Clerk is **DIRECTED** to send a copy of this Order to all counsel of record.

**IT IS SO ORDERED.**